UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------x
In re: Application of OWL SHIPPING LLC &      :
ORIOLE SHIPPING LLC for an Order Pursuant     :
to 28 U.S.C. § 1782 to Conduct Discovery for  :
for Use in Foreign Proceedings                :          No. _____
-----------------------------------------------------------------x

## DECLARATION OF SALLY-ANN UNDERHILL

I, **Sally-Ann Underhill**, Partner in the firm of Reed Smith LLP of The Broadgate Tower, 20 Primrose Street, London EC2A 2RS, Solicitors for Applicants Oriole Shipping LLC and Owl Shipping LLC, declare pursuant to 28 U.S.C. § 1746(1) as follows:

1. I am a partner in the firm of Reed Smith LLP ("**Reed Smith**"), the solicitors for Owl Shipping LLC ("**Owl**") and Oriole Shipping LLC ("**Oriole**") ("**Owners**") both of the Marshall Islands. I am duly authorised to make this Declaration in support of the Owners' Application for discovery pursuant to 28 U.S.C. § 1782.

2. I am over the age of 18 and understand and believe in the obligations of an oath.

3. Owl Shipping and Oriole Shipping are two companies whose vessels are managed by NASDAQ-listed Eagle Bulk Shipping Inc. ("Eagle"). Owl Shipping and Oriole Shipping own the vessels M/V Owl and M/V Oriole, respectively.

4. In summary, Charterers Dalian Suntime International Transportation Company Limited ("Charterers") failed to make payments in respect of the first 15 days hire and bunkers on delivery of two associated vessels, the M/V "ORIOLE" ("**ORIOLE**") and the M/V "OWL" ("**OWL**") chartered under time charters dated June 13, 2014 and June 18, 2014, respectively. Charterers subsequently paid some hire for the ORIOLE, although there is currently an outstanding balance of US$ 1,166,915.11 in respect of hire due and payable as of August, 14 2014, and August, 29 2014, and for bunkers and port agency costs at Nakhodka. The amounts currently outstanding by way of hire and bunkers are therefore US$US$ 1,166,915.11 on the ORIOLE and US$216,336,60 on the OWL. These sums remain due and outstanding and/or Charterers are liable to pay damages in that amount. Further, Owners have an additional claim for damages arising out of Charterers' repudiation of the Owl charterparty (as defined below)

estimated at US$1,330,000 (140 days from July 2, 2014 to November 19, 2014@ US$9,500 per day).

5. For the reasons set out below, I believe there is a substantial need for documents and information from Dalian and their affiliates. Without documents and information regarding the financial position of Dalian, there is a substantial risk that Owl and Oriole will be left with no remedy at law or otherwise to protect their interests or pursue their valid claims.

6. In particular, it is Owners' position that Charterers, Dalian entered the charterparties in bad faith, knowing they did not have the funds to make the initial payments due following delivery. Charterers have also given a number of false assurances that payments would be made to Owners and have given a misleading account of their assets and financial position. There is also evidence that Charterers have behaved similarly on recent previous occasions, paying other shipowners either late or not at all. This information is directly relevant to the LMAA arbitration proceedings which have been commenced against Dalian in London, England.

7. Individual(s) and/or entities within this district, are believed to possess information regarding past transactions, current transactions, and the financial ability of Dalian prior to and at the execution of the charter party agreements with Owl and Oriole. Ms. Magic Sun is believed to be the general manager of Suntime America, Inc. an affiliate of the Charterers, which is based in South River, NJ. *See* Exhibit 3 attached hereto. Further, Dalian Suntime International Transportation (USA) Inc. is another affiliate of the Charterers, which has a place of business within the State of New Jersey in East Brunswick and thus within the Court's jurisdiction. *See* Exhibit 3 attached hereto.

8. As a result of matters explained below, the issue of financial ability to meet the obligations of the charter parties is of relevance to the adjudication of the merits of these claims in the LMAA arbitration proceedings. It is this information which the Applicants seek to discover.

### The Charterparties

9. By way of a time charterparty dated June 13, 2014 (the "**Oriole Charterparty**"), Oriole Shipping chartered the ORIOLE to Charterers for a period of minimum 5 to about 7 months (about meaning +/- 15 days) at a daily hire rate of US$9,850.

10. By way of a time charterparty dated June 18, 2014 (the "**Owl Charterparty**"), Owl Shipping chartered the OWL to Charterers for a period of minimum 5 to about 7 months (about meaning +/- 15 days) at a daily hire rate of US$9,500.

11. Insofar as relevant, the terms of the two charterparties are substantially the same. The recap to the Owl Charterparty and the Oriole Charterparty each state as follows:

    "first 15 days hire plus value of BOD[1] to be paid to ows bank within 3 banking days after vsl delivery".

12. The Owl Charterparty and the Oriole Charterparty each contain the following relevant terms (including amendments recorded in the recaps):

    "**Clause 7: Charterers to Provide**

    "The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory garbage disposal), compulsory and customary pilotages, however pilotage in Amazon River only if compulsory and cost of pilotage in Dardanelles if needed to be for Charterers' acct, towages, agencies, commissions, consular charges...and all other usual expenses [...]"

    "**Clause 9: Bunkers**

    "Bunkers on delivery about 1600 - 1700 MT IFO plus about 70- 80 MT MDO.

    Bunkers on redelivery to be about same as on delivery.

    Bunker prices both ends: USD 478.00 per metric ton IFO and USD 700.00 per metric ton MDO.

    Value of bunkers to be paid on delivery together with first hire payment [...]"

---

[1] "bunkers on delivery"

3

**"Clause 10: Rate of Hire/Redelivery Areas and Notices"**

"Hire to be per day, pro rata, including overtime payable every 15 days in advance.

First hire payment to be made within 3 banking days after vessel's delivery together with the value of bunkers on delivery, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a day; hire shall continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the Owners [...]"

**"Clause 11: Hire Payment"**

(a) Payment

"[...] First hire and value of bunkers on delivery to be paid within 3 (three) banking days after vessel's delivery and Charterers' receipt of relevant invoice by fax or email.

....

Charterers will not agree to the assignment of hire, monies due under the Charter Party nor the Charter Party itself in any circumstances whatsoever"

(b) Grace Period

"Where there is failure to make punctual and regular payment of hire and/or bunkers due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 3 (three) clear banking days (as recognised at the agreed place of payment) written notice to rectify the failure, and when so rectified within those 3 (three) days following the Owners' notice, the payment shall stand as regular and punctual [...]

Failure by the Charterers to pay the hire within 3(three) days of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11(a) above."

**Clause 23: Liens**

"The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once."

**Clause 45: Arbitration**

"All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred

4

to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire...Any dispute arising hereunder shall be governed by English Law."

**Clause 98: Bills of Lading**

"In the case Original Bill(s) of Lading are not available prior to vessel's arrival at the discharge port, Owners to allow discharge of the cargo against Charterers' Letter of Indemnity basis Owners' PANDI Club standard wording issued on Charterers' letterhead and signed by an authorized officer of the Charterers only without bank countersignature.

For all steel cargoes, Charterers' Bill(s) of Lading to be issued and Owners to be sent a copy of the Bill(s) of Lading for review as soon as possible, but for 1st trip only."

## The OWL Claim

13. The OWL was delivered to Charterers at 05:00 LT on June 19, 2014.

14. The OWL immediately loaded a cargo of steel coils at Shanghai for Bao Steel and was due to load at two further Chinese ports, Changsu (ETA 3/4 July) and Rizhao (ETA 6/7 July). The voyage instructions sent by Charterers to the Master indicated the discharge ports were Veracruz/Altamira, Mexico/Houston/ New Orleans USA.

15. On Thursday, June 19, 2014, the day of delivery, in accordance with clause 11 of the Owl Charterparty, Eagle sent an invoice to Charterers by e-mail for US$ 496,032.25 in respect of 15 days' hire and bunkers on delivery.

16. Eagle sent the hire statement to the Charterer's broker at 16:50 New York time. Pursuant to clause 11, the Charterers had three banking days from receipt of the invoice to pay. Payment was therefore due by June 24, 2014 but was not made.

17. Although the Charterers did not assert that their failure to pay was caused by any *"oversight, negligence, errors or omissions on the part of the Charterers or their bankers"*, Eagle nevertheless sent anti-technicality notices pursuant to clause 11(b) of the Owl Charterparty on Tuesday, June 24, 2014, and again on Thursday, June 26, 2014 at 03:38 BST, giving Charterers three clear banking days to make payment, and threatening to suspend performance/withdraw the vessel, should payment not be made. Charterers therefore had until 00:01 BST on July 2, 2014 to make payment,

that being 3 clear banking days as recognised at the agreed place of payment, which was the Royal Bank of Scotland, Shipping Business Centre, 5-10 Great Tower Street, London EC3P 3HX.

18. To date, Charterers have failed to pay hire and failed to pay for bunkers as required by the terms of the charter party agreement. The anti-technicality notice expired at 00:01 BST on July 2, 2014. therefore later that day Eagle gave notice terminating the Owl Charterparty and/or withdrawing the OWL.

### The ORIOLE

19. The ORIOLE was delivered to Charterers at 16:01 GMT on June 15, 2014.

20. The vessel loaded a cargo of steel coils at Bayuquan, the first load port, at Tianjin, the second load port, and at Caofeidian, the third load port.

21. Mate's Receipts have been issued for the cargo loaded at Bayuquan and at Tianjin. The Tianjin Mate's Receipts indicate *"freight prepaid"*. I therefore infer that the Charterers have received freight for the cargo loaded at Tianjin. I have not seen copies of Mate's Receipts for the third load port of Caofeidian.

22. A cargo manifest issued for cargo loaded at Bayuquan indicates discharge ports of New Haven, CT and Camden, NJ, USA. Voyage instructions sent to the Master by Charterers indicate the discharge ports will be Vancouver, Los Angeles, Savannah, Camden and New Haven, all in the USA. Cargo documents issued for the second load port of Tianjin indicate various discharge ports in Guatemala, USA and Canada. Cargo documents for the third load port of Caofeidian confirm one discharge port to be Los Angeles, along with Stockton, and Long Beach, all in California, USA.

23. On Tuesday, June 17, 2014 at 16:53hrs EST (New York time), Eagle sent an invoice to Charterers for US$556,517.17 in respect of the first 15 days' hire and bunkers on delivery. Hire was therefore due 3 banking days later, on Friday, June 20, 2014.

24. On Monday, June 23, 2014 at 03:43:hrs, Eagle sent an anti-technicality notice to Charterers pursuant to clause 11(b) of the Oriole Charterparty, giving Charterers three clear banking days to pay the Oriole Outstanding Sums, and threatening to suspend performance/withdraw the vessel, should payment not be made. Charterers responded

6

to the Anti-Technicality Notice by an email of Tuesday, June 24, 2014 at 05:27 hrs. indicating that they had not yet been paid freight by their sub-charterers, and promising to remit the Oriole Outstanding Sums within the Grace Period. Charterers wrote:

> "Firstly, sorry for the outstanding hire.
>
> Chrts are still waiting and urging our sub-chrts to pay the freight to our account and Chrts will remit the 1st hire within the Grace Period.
>
> Regarding the stagnant market, pls Owners kindly understand the problems Chrts are facing, and have faith in Chrts.
>
> Thanks for your great understanding and patience in advance."

25. By email of Wednesday, June 25, 2014, Charterers informed Oriole Shipping that they had paid US$143,371.98, representing the first 15 days' hire up to 30 June 2014, and attached a bank slip. Payment for bunkers on delivery, and some small discrepancies as regards gratuities and bunkers used after arrival but prior to delivery in the sum of US$413,145.79 remained outstanding.

26. On Thursday, June 26, 2014 at 15:14hrs, Charterers sent a further e-mail to Eagle informing them that the ORIOLE would complete loading at Tianjin at 23:00 LT on June 26, 2014 indicating again that they were negotiating with Bao Steel so the sub-freight could be paid direct to Owl Shipping and Oriole Shipping, and requesting Oriole Shipping to authorise the Master to sign all departure documents.

27. On June 30, 2014, Charterers emailed Oriole Shipping informing them that the bunkers on delivery value and second hire would be remitted during the week of June 30, 2014, and requesting them to instruct the Master to berth and commence loading operations. That payment was not received.

28. The next hire payment was due from Charterers on Monday, June 30, 2014 for the period up to and including July 15, 2014. It was not paid.

29. On Tuesday, July 1, 2014, Oriole Shipping sent a further anti-technicality notice to Charterers pursuant to clause 11(b) of the Oriole Charterparty and a Statement of Accounts Recap that gave Charterers three clear banking days to pay US$ 556,049.16 (for bunkers and the second hire payment), and threatening to suspend performance

7

and withdraw the vessel, should payment not be made. On July 4, 2014, Charterers confirmed they had made payment to Oriole Shipping of the amount of US$ 554,362.03 representing bunkers and the second hire payment.

30. The next hire payment was due from Charterers on Tuesday, July 15, 2014 for the period up to and including July 30, 2014. It was not paid. On Wednesday, July 16 2014, Oriole Shipping sent a further anti-technicality notice to Charterers pursuant to clause 11(b) of the Oriole Charterparty and a Statement of Accounts Recap that gave Charterers three clear banking days to pay US$ 144,571.50 (for the third hire payment), and threatening to suspend performance and withdraw the vessel, should payment not be made. On July 16, 2014 Charterers made payment to Oriole Shipping in the amount of US$ 142,884.37, representing the third hire payment. This left an outstanding balance of hire due to Oriole Shipping of US$ 1,687.13.

31. The next hire payment was due from Charterers on Wednesday, July 30, 2014 for the period up to and including August 14, 2014. It was not paid. On Thursday, July 31, 2014, Oriole Shipping sent a further anti-technicality notice to Charterers pursuant to clause 11(b) of the Oriole Charterparty and a Statement of Accounts Recap that gave Charterers three clear banking days to pay US$ 143,234.37 (for the fourth hire payment), and threatening to suspend performance and withdraw the vessel, should payment not be made. On August 6, 2014, Charterers made payment of US$ 143,225.13, representing the fourth hire payment.

32. The next hire payment was due from Charterers on Thursday, August 14, 2014, for the period up to and including August 29, 2014. It was not paid. On Friday, August 15, 2014 Oriole Shipping sent a further anti-technicality notice to Charterers pursuant to clause 11(b) of the Oriole Charterparty and a Statement of Accounts Recap that gave Charterers three clear banking days to pay US$ 142,884.37 (for the fifth hire payment), and threatening to suspend performance and withdraw the vessel, should payment not be made. To date, payment has not been made by Charterers. The next instalment of hire is due on August 29, 2014.

33. The next hire payment was due from Charterers on Thursday, August 29, 2014, for the period up to and including September 13, 2014. It was not paid.

34. A number of the shippers, have confirmed that they have already paid freight to the Charterers. I therefore infer that bills of lading have been issued, and have copies of some of these, although these were not provided by Charterers, as required by clause 98 of the Oriole Charterparty. Further, the Oriole Charterparty requires bills of lading to be Charterers' bills. The bills of lading I have seen appear to be Owners' bills, in breach of charterparty.

35. I understand that the vessel has loaded approximately 38,899.2 mt cargo and after a delay of nearly four weeks she has now bunkered at the port of Nakhodka and taken on board parts at Hakodate, Japan, and is now en route to Vancouver, USA with an ETA of September, 17 2014. Due to Charterers' failure to provide a bunker stem to the vessel, Oriole Shipping placed their own bunker stem at Nakhodka, for which they are holding Charterers liable.

### Meetings with the Charterers' New Jersey Representative

36. On Thursday, June 26, 2014 Eagle met in their offices in New York with the purported New Jersey "representative" of Charterers, Ms Magic Sun. Ms Sun is the general manager of Suntime America Inc., a company apparently affiliated to the Charterer Dalian. During the meeting, Magic Sun:

    a) Sought to reassure Eagle that they should continue performance of the charters by stating that Charterers were ship owners in their own right, with 11 vessels that Charterers owned outright, mostly 5,000 metric tonne vessels, one of which is 25,000 metric tonnes. She gave Eagle a list of those 11 vessels and a Vessel Finder webpage printout that provided details for each. Ms Sun stated that Charterers had about 12 ships under charter per month, three of which go to the US regularly;

    b) Stated that Charterers had never had problems before, but that they needed to receive the freight due to them before they could pay under the two Charterparties. Ms Sun asked for more time to prepare the money and said that her boss had asked for a loan from the bank. This was notwithstanding the fact that Macsteel advised on Monday, June 30, 2014 that freight had already been paid. If the freight had been paid before June 26, 2014, this was disingenuous

9

        on Ms Sun's behalf as she did not say that freight had been paid. If it was received after June 26, 2014 then, according to what Ms Sun said during the meeting, this money should have been used to pay to Owners the sums outstanding;

c) Said that she was expecting US$1.8 million to be paid that day which we understood her to be saying was in respect of freight for the ORIOLE. She claimed however that no freight had been paid at the second loadport;

d) Said that about US$700,000 of freight could be collected on OWL;

e) Claimed that Charterers' had made US$35 million profit in 2013 by reference to a document headed "Income Statement." The Income Statement records revenue of over [ ] 852 million and gross profit of over [ ] 727 million. I understand that the document provided at that meeting headed 'The Balance Sheet' refers in the top right hand column to RMB (in Mandarin). The document headed 'Income Statement' refers to no particular currency. Eagle was not aware of the reference to RMB and the impression that Eagle were left with was that the Charterers had made US$35 million profit in 2013.

f) Again requested that Owl Shipping accept an assignment of the US$ 760,000 sub-freight from Baosteel, as per Charterers' email of Thursday, June 26, 2014; and

g) Stated that Charterers were expecting a loan from a Chinese bank of US$ 3 million to be paid in the middle of July 2014. When asked whether payment could be deposited in an escrow account from which Owl Shipping could draw funds as necessary, Ms Sun said that the loan was required to cover several vessels.

### Notices of Arbitration

37. On July 1, 2014, Reed Smith sent notices of arbitration to Charterers in respect of both charterparties, appointing Mr Michael Baker-Harber as arbitrator. **A true and accurate copy of the notices of arbitration sent to Dalian is attached hereto as Exhibit 1.** I confirm that Owners intend to proceed diligently and expeditiously with

10

the arbitrations against Charterers, although Charterers have not yet responded to the notices, and Mr Baker-Harber has been appointed as sole arbitrator in both references in default of Charterers' appointment of their own arbitrator.

### Termination of the Owl Charterparty

38. The anti-technicality notice having expired at 00:01 BST on July 2, 2014, Eagle gave notice later that day terminating the Owl Charterparty and/or withdrawing the OWL. Owl Shipping did so in reliance upon Charterers' failure to pay the outstanding amount due of US$496,032, which was a breach of a condition of the Owl Charterparty.

### Timing of the application

39. This application for discovery under 28 U.S.C. § 1782 is ripe and is being made in aid of foreign proceedings which have already commenced in accordance with English law.

40. Given the factual background set out above, I believe that Owl Shipping and Oriole Shipping are liable in debt and/or damages to pay the following sums to Owners:

    a) Hire due under the Owl Charterparty the sum of US$216,336.

    b) Damages for the Charterers' breach of the Owl Charterparty are estimated in the sum of US$1,330,000 calculated on the basis of the total estimated earnings of the OWL for the balance of the Charterparty term.

    c) Under the Oriole Charterparty, totalling US$1,166,915.11.

41. Accordingly, the total estimated value of both Owl and Orioles' claims is US$2,663,251.11.

42. Despite being given numerous opportunities to pay the hire due and owing, Charterers have provided no legal basis to explain why they have failed to pay upon the repeated demands made by Owners. The only point raised by Charterers has been a suggestion that the market conditions mean that it is short of cash, and they have not been paid freight by their counterparts. Indeed, Charterers have not even suggested that these

11

reasons give rise to a defence. Charterers have not yet responded to Owners' arbitration notice.

43. I believe it may be inferred from the circumstances I set out above that Charterers entered into the charterparties in bad faith, knowing that they would be unable to make the first payments for hire and bunkers.

44. When Charterers entered into the charterparties, they neither had sufficient funds to make those payments nor any means of ensuring such funds would be obtained. Instead, it appears that Charterers were relying upon receiving sufficient freight and / or bank loans to make the first payments, but not before the first payments were due. Charterers therefore entered the charterparties knowing they could immediately breach conditions that they contained. It is not known how they intended to fund further payments falling due. This is an issue to be adjudicated in the arbitration proceedings now commenced.

45. It also unclear how, if at all, Charterers expected to make future payments of hire, bunkers, port charges, canal dues, and the like. I understand that Eagle have been informed that Charterers do not have a good name in the market with bunker suppliers and it is therefore anticipated that Charterers will need to stem bunkers from physical suppliers directly. In fact, at Nakhodka, Charterers did not stem bunkers at all, and Owners had to pay for the port agency fees and for the stem of bunkers, which they did under protest.

46. Without the production of the documents set forth in the proposed subpoenas and the opportunity to conduct a deposition on said subjects, Owl and Oriole will be unable to otherwise obtain evidence which parties within New Jersey possess.

47. One of the key legal issues to be decided in the arbitration proceedings in London is whether Dalian had sufficient funds to meet its obligations under the charter parties when these agreements were executed and whether it entered into these charter parties in full knowledge of its inability to satisfy its obligations thereunder.

48. The respondents within this judicial district are believed to possess information and documents pertaining to these subjects which applicants intend to use in their LMAA submissions.

12

49. There is no other avenue for obtaining these documents and information.

50. The LMAA arbitration proceeding is the first instance decision-maker which will determine the substantive merits of the dispute and the amount of damages, if appropriate.

51. In the LMAA arbitration proceedings, the parties will be permitted to substantiate their respective claims with evidence and factual support.

52. This arbitration will be binding on all parties.

53. The decision of the arbitrators maybe subject to appeal or other consideration by the High Court of Justice, Queen's Bench Division, Commercial Court.

54. Although the LMAA cannot issue subpoenas, or compel witnesses to attend hearings, in limited circumstances the parties can apply to the English High Court to issue a witness summons for a witness based in the UK. For witnesses based outside of the UK, parties can apply to the High Court to send to the judicial authorities of the country in which that witness is based, a request for that witness to give evidence.

55. English courts have accepted evidence obtained through United States Judicial assistance under 28 U.S.C. § 1782 in the past. Attached hereto as Exhibit 2 is a copy of the House of Lords' decision in *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N V* [1987] 1 App. Cas. 24 (1986).

In accordance with 28 U.S.C. 1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2014

_____
Sally-Ann Underhill

13